JUDGE OETKEN

13 CV 3138

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

NOMURA ASSET ACCEPTANCE
CORPORATION ALTERNATIVE LOAN
TRUST, SERIES 2007-1, by HSBC BANK USA,
NATIONAL ASSOCIATION, in its capacity as
Trustee

Plaintiff,

-against-

NOMURA CREDIT & CAPITAL, INC.,

Defendant.

</td><td>

Civil Action No.:

**COMPLAINT**

JURY TRIAL DEMANDED



</td></tr>
</table>

Plaintiff, Nomura Asset Acceptance Corporation Alternative Loan Trust, Series 2007-1

(the "Trust" or "NAA 2007-1"), acting by and through HSBC Bank USA, National Association,

not individually but solely in its capacity as Trustee (the "Trustee" or "HSBC") of the Trust

acting by and through its attorneys McKool Smith P.C. and at the direction of certain holders of

residential mortgage-backed securities issued by the Trust, brings this complaint against Nomura

Credit & Capital Inc. (the "Sponsor" or "Nomura").  Except as otherwise indicated as to its own

actions and conduct, the Trustee alleges upon information and belief as follows:

## NATURE OF THE ACTION

1.      This action arises out of Nomura's breaches of contract relating to a securitized

pool of 5,780 mortgage loans (the "Mortgage Loans" or "Loans") selected and sold by Nomura

and held by the Trust for the benefit of the holders of Certificates issued by the Trust (the

"Certificateholders").  The Mortgage Loans were (and remain) the sole source of income from

which the Trust makes payments to Certificateholders.  Nomura made extensive contractual

representations and warranties regarding the characteristics of these Mortgage Loans, including

their credit quality and their compliance with applicable laws. Potential investors in the Certificates relied upon those representations and warranties and did not have access to the information necessary to verify whether the Mortgage Loans were accurately described by Nomura in compliance with them. Thus, Nomura's representations and warranties were essential to the securitization of the Mortgage Loans and investors' decision to invest in the Certificates issued by the Trust.

2.      Highlighting the critical importance of these representations and warranties, Nomura further promised to cure any breach of the representations and warranties that materially and adversely affected the value of any Mortgage Loan or the interest of Certificateholders in the Loans or, if it failed to cure within ninety days, to repurchase the Loan. This obligation to cure or repurchase was not contingent on any action by any other party; Nomura had an independent obligation both (i) to notify the Trustee when it discovered a breach on its own, and (ii) to cure or repurchase the affected Loan within ninety days of becoming aware of a breach of a representation and warranty through either its own discovery or notice from any other transaction party.[1] In essence, the parties agreed that Certificateholders would assume the risk that there might be defaults on Mortgage Loans which conformed to Nomura's representations and warranties but that Nomura would assume the risk that Loans failed to meet those representations and warranties in the first instance.

3.      Despite clear evidence of numerous breaches of representations and warranties with respect to the Mortgage Loans in the Trust, Nomura has failed, and continues to fail, to fulfill its promise to cure the breaches or repurchase those Loans. A forensic review (the "Loan

---

[1] If the breach was discovered within the first two years after the Trust was created, Nomura could also replace the defective loan with one that complied with the representations and warranties.

Review") of the Group II Mortgage Loans (the subset of the Mortgage Loans at issue here) revealed that at least 1,584 Group II Mortgage Loans—*70.5 percent of the loan group*—breached one or more of Nomura's representations and warranties in a manner that materially and adversely affected the value of those Loans and the interests of Certificateholders in them. These Group II Mortgage Loans have an original principal balance of over $565 million. The Trustee promptly notified Nomura of these breaches, including a detailed description of the basis for each breach. The Trustee demanded that Nomura cure the breaches or repurchase the defective Mortgage Loans as it had promised. At least ninety days have passed since the Trustee's demands, but Nomura has failed to cure a single breach or repurchase a single Mortgage Loan—*including 111 Group II Mortgage Loans that Nomura has conceded materially breach its representations and warranties*.

       4.     The Trustee's notices were not Nomura's first indication that material breaches existed with respect to the Mortgage Loans. Nomura's routine practice was to conduct due diligence on each mortgage pool it intended to securitize by having a third party review a sample of the mortgage loans to determine whether they complied with the applicable underwriting guidelines. Nomura conducted such due diligence on a sample of the Mortgage Loans and through that due diligence discovered facts demonstrating that its representations and warranties were false with respect to a substantial number of Group II Mortgage Loans, including breaches subsequently identified by the Loan Review. Nomura's discovery of the breaches carried through to the closing of the securitization transaction and beyond that date, such that Nomura had an obligation on day one to both provide notice to the Trustee of the breaches in question and to cure the breaches, substitute non-breaching loans for the breaching loans, or repurchase the breaching loans. It has failed to perform any of these obligations.

5.      Nomura's failure to comply with its contractual obligations strikes at the heart of the parties' bargain.  The Certificates are priced, marketed, and sold based upon the expected aggregate cash flows generated from principal and interest payments on the Mortgage Loans. Under the terms of the securitization, the Certificateholders assumed the risk that some borrowers might default on their Mortgage Loans and that, as a result, the Trust's cash flows could drop below the level necessary to pay scheduled distributions on the Certificates.  But potential Certificateholders' ability to assess that risk depended on an accurate understanding of the credit quality and other characteristics of the Mortgage Loans.

6.      Nomura was the "Sponsor" of the transaction.  In its role as Sponsor, Nomura selected the mortgage companies from which to obtain mortgage loans, selected the loans to include in the Trust, and chose the servicer of the loans and the parties to administer the Trust.  It had far more information about the Mortgage Loans than any other transaction party.  Nomura had regular contact, and a direct contractual relationship, with the companies that originated the Mortgage Loans.  Moreover, as part of its purchase, Nomura received the documentation supporting each Mortgage Loan (the "Loan File"), which typically included the borrower's loan application, credit report, income, asset and employment verifications, disclosures and an appraisal of the subject property.  Nomura therefore selected the Mortgage Loans to place in the Trust with full access to detailed information on each and thus the ability to ensure its representations and warranties were accurate.

7.      By contrast, potential Certificateholders had only one source of information about the Mortgage Loans—Nomura.  They had no means to verify the accuracy of information they received from Nomura.  They were instead forced to rely exclusively on Nomura's representations and warranties.  Indeed, the closing of the transaction *was expressly conditioned*

4

on Nomura's representations and warranties being true and correct. The risk that these representations and warranties were inaccurate or incomplete was allocated in its entirety to Nomura through its cure or repurchase obligation.

8.    Without Nomura's representations and warranties—and its accompanying promise to cure or repurchase when such representations and warranties are violated—investors would not have invested in the Certificates backed by the Mortgage Loans, and Nomura would not have received the substantial fees and other compensation flowing to it from this transaction.

9.    Nomura's decision to include no fewer than 1,584 defective Mortgage Loans in the Trust materially breached Nomura's representations and warranties and, coupled with its subsequent and further breaches in refusing to cure or repurchase those Loans, fundamentally alters the transaction contemplated by the parties in the PSA and MLPA. To begin with, the sheer number of defective loans sold to the Trust far exceeds the reasonable expectations of the parties. While the cure/repurchase mechanism provided a safety valve for a handful of mistakes, it was not a license for Nomura to securitize thousands of defective Mortgage Loans. The nature and extent of these breaches further destroyed the economic rationale for the transaction, which was intended to create Certificates backed by a pool of mortgage loans with understandable and disclosed risks. The inclusion of at least 1,584 defective Mortgage Loans in the Trust created a significantly different and riskier investment than the Trust and Certificateholders bargained for.

10.    Nomura's failure to provide notice of breaches it discovered, and its refusal to cure or repurchase the identified Mortgage Loans (identified either through notice from the Trustee or Nomura's own knowledge), entitle the Trust to compensatory damages and/or specific performance to compel Nomura to repurchase the Mortgage Loans for which it has been given

notice, as well as any other Mortgage Loans that Nomura knows or has reason to know contain similar breaches.

## PARTIES

11.     The Trust is a New York common law trust established pursuant to a Pooling and Servicing Agreement dated April 1, 2007, with a Closing Date of May 10, 2007, among Nomura Asset Acceptance Corporation, as Depositor, GMAC Mortgage LLC, as Servicer, Wells Fargo Bank, National Association, as Master Servicer and Securities Administrator, and HSBC, as Trustee (the "PSA").[2]  The Trust itself is not a juridical entity.  HSBC is a national banking association organized and existing under the laws of the United States with its registered main office in McLean, Virginia, and serves as Trustee of the Trust under the terms of the PSA. HSBC, acting solely in its capacity as Trustee and on behalf of the Trust, has undertaken the conduct of this litigation pursuant to the direction of certain Certificateholders of the Trust.

12.     Nomura Capital & Credit, Inc. is a Delaware corporation with a principal place of business in New York, New York.  Nomura was both the Sponsor under the PSA and the Seller of the Mortgage Loans under a Mortgage Loan Purchase Agreement, dated May 10, 2007 (the "MLPA").[3]

## JURISDICTION AND VENUE

13.     This Court has jurisdiction and venue over this proceeding pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of costs, exceeds $75,000.  For diversity purposes, a national banking association's citizenship is determined solely by the location of its main office.

---

[2] A true and correct copy of the PSA is attached hereto as Exhibit 1.

[3] A true and correct copy of the MLPA is attached hereto as Exhibit 2.

14.     Venue is proper in this district pursuant to 28 U.S.C. §1391(1) because Nomura is a foreign corporation authorized to transact business within this judicial district.  Additionally, venue is proper in this district pursuant to 28 U.S.C. § 1391(2) because a substantial part of the events and omissions that give rise to the claims herein occurred in New York.  The Trust was formed under New York law, Nomura made the relevant representations and warranties and undertook the relevant obligations in New York, and the agreements are expressly governed by New York law.

## FACTUAL BACKGROUND

### I.   THE NAA 2007-1 SECURITIZATION.

15.     This case concerns mortgage-backed pass-through certificates, more commonly known as residential mortgage-backed securities.  Asset-backed securitizations distribute risk by pooling cash-producing assets, such as mortgage loans, and issuing securities backed by that pool of assets.  The most common form of securitization of mortgage loans involves the creation of a trust to which a sponsor entity sells a portfolio of mortgage loans.  The transfer of assets to a trust is typically a two-step process:  "the financial assets are transferred by the sponsor first to an intermediate entity, often a limited purpose entity created by the sponsor . . . and commonly called a depositor, and then the depositor will transfer the assets to the [trust] for the particular asset-backed transaction."   Asset-Backed Securities, Securities Act Release No. 33-8518, Exchange Act Release No. 34-50905, 84 SEC Docket 1624 (Dec. 22, 2004).

16.     After receiving a pool of mortgage loans, the trust issues securities, known as certificates, using the pool of loans as collateral.  Investors in the certificates acquire rights to the income flowing from the mortgages (borrowers' payments of principal and interest on their mortgages).

7

17.     The Trust at issue here was created through, essentially, the process described above.  Nomura was the Sponsor of the NAA 2007-1 securitization.  As the Sponsor, Nomura selected a mortgage pool of 5,780 Loans with an aggregate principal balance of approximately $1.59 billion.  Nomura purchased the Mortgage Loans from a variety of mortgage origination companies, and sold them to its affiliate Nomura Asset Acceptance Corporation (the "Depositor") on the Closing Date of May 10, 2007 pursuant to the MLPA.  Pursuant to the PSA, the Depositor simultaneously conveyed the Mortgage Loans to the Trust, which issued approximately $1.58 billion in Certificates and delivered those Certificates to the Depositor.

18.     Concurrently with its transfer of the Mortgage Loans, the Depositor also transferred, assigned, set over and otherwise conveyed to the Trustee "all of its rights and interest under the Mortgage Loan Purchase Agreement."  PSA § 2.01.  The Trustee was thus "entitled to exercise all rights of the Depositor under the Mortgage Loan Purchase Agreement as if, for such purpose, it was the Depositor."  PSA § 2.01.

19.     The Mortgage Loans were divided into two groups, Group I and Group II.  Group I consisted of approximately 3,532 Mortgage Loans with an aggregate principal balance of approximately $817.6 million.  The cash flows from Group I Mortgage Loans are distributed primarily to particular Certificates, the Group I Certificates.  Group II consisted of approximately 2,248 Mortgage Loans with an aggregate principal balance of approximately $774.8 million.  Cash flows from Group II Mortgage Loans are distributed primarily to the Group II Certificates.

20.     The Trust is administered by several entities, including the Trustee; the Securities Administrator and Master Servicer, Wells Fargo Bank, N.A.; and the Servicer (for Group II Mortgage Loans), GMAC Mortgage, LLC.  The Servicer is, among other things, responsible for collecting monthly mortgage payments from borrowers and seeking to recover from borrowers

who default on their Mortgage Loans, consistent with the PSA and generally accepted servicing standards. The Master Servicer is responsible for aggregating monthly reports and remittances from the Servicers and for generally overseeing the performance of the Servicers under the governing agreements. The Securities Administrator acts as the certificate registrar and paying agent, which means, among other things, it is responsible for distributions to Certificateholders. The Master Servicer, the Securities Administrator and the Servicer act independently of the Trustee pursuant to the terms of the PSA.

21.     The Trust therefore holds the Mortgage Loans for the benefit of the Certificateholders. The Trustee, as assignee of the Depositor, has the right to enforce Nomura's representations and warranties under the MLPA and its obligation to cure or repurchase Mortgage Loans that fail to comply with such representations and warranties in a manner that materially adversely affects the value of the Mortgage Loans or the interests of Certificateholders therein.

## II.     NOMURA'S REPRESENTATIONS AND WARRANTIES.

22.     Nomura's representations and warranties regarding the Mortgage Loans are specified in Section 8 of the MLPA, which is attached as Exhibit C to the PSA, and include, without limitation, the following:

- "No fraud has taken place on the part of the Mortgagor or any other party involved in the origination or servicing of the Mortgage Loan;" MLPA, §8 (ii).

- "Any and all requirements of any federal, state or local law including, without limitation, usury, truth in lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, fair housing, predatory, fair lending or disclosure laws applicable to the origination and servicing of the Mortgage Loans, including prepayment charges, if any, have been complied with in all material respects, and the consummation of the transactions contemplated hereby will not involve the violation of any such laws;" MLPA, §8 (viii).

- "There is no material default, breach, violation event or event of acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a material default, breach, violation or event of acceleration, and the Seller has not, nor has its predecessors, waived any material default, breach, violation or event of acceleration;" MLPA, §8 (xiv).

- "Each Mortgage Loan is and will be a mortgage loan arising out of the originator's practice in accordance with the originator's underwriting guidelines;" MLPA, §8 (xli).

23.     Nomura's representations and warranties were, and remain, material to the Trust and the Certificateholders.  Indeed, Section 10 of the MLPA expressly makes the accuracy of Nomura's representations and warranties a condition to the closing of the transaction: "The closing shall be subject to each of the following conditions:  (a) All of the representations and warranties of [Nomura] under this Agreement shall be true and correct in all material respects as of the date as of which they are made and no event shall have occurred which, with notice or the passage of time, would constitute a default under this [MLPA]."

24.     Through the representations and warranties, Nomura promised that, as of the Closing Date, the Mortgage Loans met certain credit quality thresholds regarding the borrowers' ability to repay their loans on time and in full, that the Mortgage Loans were originated in compliance with legal requirements, and that the documentation required to issue (and enforce) the Mortgage Loans was complete.  Without these assurances, the Certificates would not have been purchased by investors, or at the very least, would not have been purchased on the same economic terms.

25.     The MLPA provides that "[w]ithin 90 days of [Nomura's] discovery or its receipt of notice of any such missing documentation that was not transferred by the Seller as described above, or of materially defective documentation, or within 90 days of any such breach of a

10

representation and warranty, the Seller promptly shall deliver such missing document or cure

such defect or breach in all material respects or, in the event the Seller cannot deliver such

missing document or cannot cure such defect or breach, the Seller shall, within 90 days of its

discovery or receipt of notice of any such missing or materially defective documentation or

within 90 days of any such breach of a representation and warranty, either (i) repurchase the

affected Mortgage Loan at the Purchase Price (as such term is defined in the Pooling and

Servicing Agreement) or (ii) pursuant to the provisions of the Pooling and Servicing Agreement,

cause the removal of such Mortgage Loan from the Trust Fund and substitute one or more

Replacement Mortgage Loans.  MLPA § 9(a).  Pursuant to Section 2.03 of the PSA, substitution

of a breaching Mortgage Loan may only occur within two years of the Closing Date.  This option

is thus no longer available to the Trust, as the Closing Date was in 2007.

26.     Consistent with the clear allocation of risk between the Trust and Nomura, the

MLPA requires Nomura to repurchase defective Mortgage Loans regardless of whether Nomura

was aware of the breach at the time the representations and warranties were made—even with

respect to representations and warranties made to the best of Nomura's knowledge.

> With respect to the representations and warranties contained herein
> as to which the Seller has no knowledge, if it is discovered that the
> substance of any such representation and warranty was inaccurate
> as of the date such representation and warranty was made or
> deemed to be made, and such inaccuracy materially and adversely
> affects the value of the related Mortgage Loan or the interest
> therein of the Purchaser or the Purchaser's assignee, transferee or
> designee, *then notwithstanding the lack of knowledge by the*
> *Seller* with respect to the substance of such representation and
> warranty being inaccurate at the time the representation and
> warranty was made, the Seller shall take such action described in
> the following paragraph in respect of such Mortgage Loan.

MLPA § 9(a) (emphasis added).

27.    The PSA provides that upon any party's discovery of a breach, that party must notify the other parties.  The Trustee is one of the parties then charged with requesting that Nomura, as Sponsor, cure the breaches or repurchase the Mortgage Loans.  PSA §2.03(c).  If Nomura cannot cure the breach it must "repurchase the affected Mortgage Loan or Mortgage Loans from the Trustee at the Purchase Price." *Id.*

28.    The PSA defines Purchase Price as:

> With respect to any Mortgage Loan required to be repurchased by the Sponsor pursuant to Section 2.02, 2.03 or 3.24 hereof and as confirmed by an Officer's Certificate from the Sponsor to the Trustee and the Group I Certificate Insurer or Class IT-A-M Certificate Insurer, as applicable, an amount equal to the sum of (i) 100% of the outstanding principal balance of the Mortgage Loan as of the date of such purchase plus, (ii) thirty (30) days' accrued interest thereon at the applicable Net Mortgage Rate, plus any portion of the Servicing Fee, Servicing Advances and Advances payable to the related Servicer or Master Servicer, as applicable, with respect to such Mortgage Loan plus (iii) any costs and damages of the Trust Fund in connection with any violation by such Mortgage Loan of any abusive or predatory lending law, including any expenses incurred by the Trustee with respect to such Mortgage Loan prior to the purchase thereof.

PSA § 1.01.

29.    The PSA also establishes that Nomura "shall promptly reimburse the Trustee for any expenses reasonably incurred by the Trustee in respect of enforcing the remedies for such breach." §2.03(c).

30.    Nomura's cure or repurchase obligation was central to the securitization of the Mortgage Loans because it (1) incentivized Nomura to ensure that the Mortgage Loans were issued using prudent lending practices and (2) allocated the risk of poor lending practices to the party best able to detect and prevent them—Nomura.  Traditionally, loan originators financed their mortgage business through customer deposits, retained ownership of the loans they

12

originated, and directly received mortgage payments from borrowers. They earned a profit based on the spread between the interest they received on the loans and the interest they paid on the depository accounts. When an originator held a mortgage through the term of the loan, it alone bore the risk of loss if the borrower defaulted and the value of the collateral was insufficient to repay the loan. As a result, originators had a strong economic incentive to apply prudent underwriting standards to verify the borrower's creditworthiness.

31.     Mortgage securitization can remove these incentives toward prudent lending. In the securitization context, originators earn a profit from the sale of the loan rather than the interest spread. Once the loans are sold, the credit risk on those loans shifts to investors. Thus, the more loans an originator issues, the more product it has available for sale and the more profit it can generate. Rather than being a key component of profitability, underwriting guidelines and other credit criteria act as a constraint on profitability, because they restrict a lender from issuing more loans to less creditworthy borrowers. By undercutting or ignoring those credit criteria, the lender can issue more loans. As long as the lender sells the loan, it does not take on additional risk by issuing riskier loans—it just makes more money.

32.     Likewise, if a sponsor originates or purchases loans to hold on its books as investments, the risk of default will loom large in its decision to issue or purchase the loans. But because securitization sponsors intend to sell and securitize most of the loans, their primary focus may become increasing volume, even at the expense of credit quality. If they are allowed to escape their obligation to cure or repurchase defective loans, they could pass the increased and undisclosed risk of default onto investors, and thereby will have little incentive to carefully scrutinize the loans they acquire.

33.     The cure/repurchase mechanism provides an essential deterrent to such misconduct.  If a sponsor is faced with the risk that it will be forced to repurchase a materially deficient loan, the sponsor will have the necessary incentive to ensure that its representations and warranties are accurate.  And because the sponsor is in the best position to verify the quality of the loans it intends to securitize, allocating the risk of deficiencies in the loans to the sponsor is appropriate and reasonable.

34.     However, the cure/repurchase mechanism was not a cure-all by which investors or trusts accepted the possibility of pervasive breaches—breaches that would leave the trust and investors with either a significantly riskier pool of assets that were far less likely to perform or a far smaller pool of assets (with more limited cash flows) from which to pay investors after the sponsor repurchased the defective loans.  Indeed, a sponsor that intended in good faith to abide by its repurchase obligation would never securitize—and would take steps to insure it did not securitize—a pool of mortgage loans rife with violations of representations and warranties.

## III.   NOMURA'S BREACHES OF ITS REPRESENTATIONS AND WARRANTIES.

35.     Loan Files were obtained for the overwhelming majority of Mortgage Loans, including Group II Mortgage Loans, for the purpose of conducting the Loan Review.  The Loan Review analyzed the credit, collateral and compliance components of Mortgage Loans, comparing the underwriting parameters and standards in place at the time of origination against the representations and warranties contained in the MLPA.  This type of review is also known as a "re-underwriting" because it repeats the loan underwriting exercise the loan originator was supposed to conduct prior to issuing the loan.

36.     The Loan Review did not reveal merely that *some* Mortgage Loans breached Nomura's representations and warranties.  Of the 2,248 Group II Mortgage Loans reviewed,

14

1,584 Loans (70.5 percent) contained at least one breach that had a material and adverse impact on the value of the Mortgage Loan or the Certificateholders' interests therein; many had multiple such breaches. These breaches included such fundamental issues as misrepresentations of borrower income, the occupancy status of the property and the borrower's debt obligations; violations of underwriting guidelines without any compensating factors; incorrect calculations of debt and debt-to-income ratios; excessive loan-to-value ratios; violation of high cost loan statutes and other applicable laws; and significant inaccuracies in the Mortgage Loan Schedule. The 1,584 defective Group II Mortgage Loans are listed in Exhibit 3 hereto.

37.     These breaches substantially undermine the value of these Mortgage Loans and the interests of Certificateholders by, among other things, concealing the heightened risks inherent in the loans. Among other things, a borrower's income and other debt obligations are primary factors used to assess whether the borrower is able to repay a loan. Indeed, the ratio of monthly debt payments to monthly income (also known as the debt-to-income or "DTI" ratio) is a primary criterion in the underwriting process. Loan-to-value ("LTV") ratio is also a key criterion for assessing the likelihood that a borrower will repay a loan, and are also used to determine the ability of the owner of the loan to recover against the subject property in the event foreclosure is necessary. The LTV ratio reflects the percentage of the property value covering the Mortgage Loan. For example, a 75% LTV ratio means that the mortgage equals 75% of the property's value, and the borrower owns the remaining 25% in value as equity. That 25% equity provides the borrower with an important incentive not to default (and potentially lose his/her equity in the property) and also acts as a cushion in the event a borrower is unable to pay. The higher the LTV ratio, the higher the risk that the Trust will be unable to recover the full value of the loan through foreclosure.

38.    Occupancy status also directly impacts the risk profile of the loan because the borrower is much less likely to default on a mortgage secured by her primary residence than she is on a loan secured by a second home or investment property.  Likewise, accurate information concerning a borrower's cash and other assets is important in assessing risk because these assets provide an alternative source of loan repayment in the event a borrower losses his/her job.

39.    Finally, mortgage loans with missing documentation or that fail to comply with applicable law can, among other things, be more difficult to enforce against the borrower or subject property, may increase the difficulty and expense of servicing the loans, and make it virtually impossible to fully and completely verify that the Mortgage Loan was as represented.  Fundamentally, such mortgage loans should never have been issued.  As a result, Nomura agreed that any breach of certain representations and warranties concerning the Mortgage Loans' compliance with federal and state law "shall be automatically deemed to affect materially and adversely the interests" of the Trust and Certificateholders.  *See* MLPA § 9(a); PSA § 2.03(c).

40.    The defective Mortgage Loans in the Trust at issue here often contain breaches of more than one representation and warranty, further increasing the risk to Certificateholders and decreasing the value of the Loans.  The following examples are illustrative:

- Loan xxxxxx7918:   This loan was originated in 2006 under a Stated Income/Verified Asset loan program with an original loan balance of $560,000.00.  On the loan application, the borrower stated self-employment as the "Owner" of a security company, earning $33,000 per month.  The borrower's claimed income was grossly unreasonable and was not supported by the information in the Loan File, which contained a copy of the borrower's Social Security Statement reflecting that the highest annual income that the borrower had earned was $42,096 in 2004.  Additionally, the borrower filed for bankruptcy in 2008, and the bankruptcy court filings revealed that the borrower's actual income in 2007 was $5,710, or $475.83 per month.  Further, the borrower's debt obligations were underreported.  The underwriting guidelines required the borrower to disclose all debt obligations, including debts not yet listed in the borrower's credit report.  A property and credit records search revealed that the

borrower also had four other debt obligations, in amounts of $480,000, $120,000, $13,658 and $65,661, which were not disclosed. These additional obligations increased the borrower's monthly debt obligations by approximately $6,074, which severely decreased the borrower's ability to repay the subject loan. In addition, based on the borrower's actual monthly income and undisclosed debts, the borrower's DTI was 422.16%, which far exceeded the lender's guideline maximum of 60%. Further, the underwriting guidelines required that either a written verification of deposit or two months of consecutive bank statements be obtained in order to verify that the borrower's assets were properly sourced and seasoned for 60 days. Despite this requirement, the Loan File contained bank statements covering only a one month period, resulting in a $38,006 shortage of verified assets. Finally, the underwriting guidelines required a fully executed second lien note when second lien was established simultaneously with the first lien. Here, the first lien and second lien were originated at the same time, yet the loan file did not contain a copy of the second lien note as required.

- Loan xxxxxx4351: This loan was originated in 2006 under a Stated Income/Verified Asset loan program with an original loan balance of $1,500,000.00. On the loan application, the borrower stated self-employment as the "Owner" of a financial services company, earning $45,000 per month. The borrower's claimed income was not supported by the information in the Loan File, which contained a CPA letter evidencing the borrower's self-employment which listed the same address and contact information for the CPA as for the borrower's stated business. A public records search revealed that the CPA license referred to in the letter was actually associated with a different name. The CPA and firm identified in the letter could not be located. Additionally, the borrower filed for bankruptcy in 2009, and the bankruptcy court filings revealed that the borrower held no business ownership and received no income in the preceding six years. Further, the underwriting guidelines required that the payment shock associated with the loan not exceed 200%, yet the borrower's monthly housing payment increased from $3,400 to $14,058, resulting in a payment shock of 313.47%. Finally, the underwriting guidelines required verification of the borrower's housing history for the twelve months preceding the subject loan's closing. Despite this requirement, the Loan File was missing verification of five months of the borrower's rental payments.

- Loan xxxxxx3589: This loan was originated in 2006 under a Stated Income/Verified Asset loan program with an original loan balance of $754,400.00. On the loan application, the borrower stated self-employment for three years as a "Co-Owner/Development" of a condominium, earning $83,333 per month. The borrower's claimed income was grossly unreasonable and was not supported by the information in the Loan File. The Loan File did not contain any verbal verification of the borrower's employment, as was required by the underwriting guidelines, the origination credit report did not reflect the borrower's claimed employment, seven of nine verifications of deposit contained in the Loan File were not in the borrower's name and the borrower indicated total

17

assets of only $26,869.   Further, the borrower's debt obligations were underreported.  The underwriting guidelines required the borrower to disclose all debt obligations, including debts not yet listed in the borrower's credit report.  A property and credit records search revealed that the borrower also held six other mortgages associated with properties in the same development as the subject property in amounts of $754,500, $89,080, $712,640, $89,080, $81,720 and $94,300, none of which were disclosed.  These additional mortgages increased the borrower's monthly debt obligations by $17,249, which severely decreased the borrower's ability to repay the subject loan.  Further, the subject was a condo-hotel, which was identified by the applicable underwriting guidelines as an ineligible property type unless the subject property measured a minimum of 600 square feet and contained kitchen facilities, and the subject development had been open and operating as a condo-hotel for at least two years with an independent homeowner's association and at least 75% of the units sold or conveyed.  However, the appraisal in the Loan File indicated that the subject unit was a studio with no kitchen facilities and that the condo-hotel project was a new conversion that had not been operating for two years.  No units had been sold or conveyed, and the homeowner's association remained under the control of the developer. The applicable underwriting guidelines further required that all condo-hotel purchases be approved under the Full Documentation/Alternative Documentation program, yet the subject loan was approved under the Stated Income/Verified Asset loan program.  The applicable underwriting guidelines also permitted a maximum CLTV 75% for condo-hotel units with a loan amount exceeding $350,000, but the subject loan was approved and closed with a CLTV of 90%.   The underwriting guidelines further permitted a maximum seller concession of 0% for loans with a CLTV of 90%, yet the final HUD-1 indicated that the borrower received seller contributions of $25,408.84, or 2.69% of the loan amount.  The underwriting guidelines also required the disclosure of any non-arms' length transaction.  However, the final HUD-1 indicated that a business in which the borrower had an interest was an owner of the subject property, a fact not disclosed by the borrower.  Finally, the warranties (and the underwriting guidelines) required loans to comply with all federal, state and local regulatory requirements and to maintain the final Truth in Lending statement executed by the borrower in the Loan File.  Despite this requirement, the final Truth in Lending statement was missing from the Loan File.

41.     Given the number, extent, and nature of the breaches uncovered by the Loan Review, it is not commercially plausible that Nomura's own due diligence, conducted, on information and belief, before it even made the representations and warranties, did not reveal the same problems with the Mortgage Loans.  Here, where at least 1,584 of the Mortgage Loans in the pool were riddled with material breaches, due diligence on even a small sample would have

alerted Nomura to fundamental problems with the pool, and in particular with Loan Group II. Accordingly, Nomura delivered to the Trust substantial numbers of Group II Mortgage Loans that failed to conform to the representations and warranties Nomura made to the Trust regarding those loans. Nomura's failure to notify the Trustee of the breaches it had discovered and its failure to cure or repurchase the affected Group II Mortgage Loans, constitute separate and independent breaches of multiple provisions of the MLPA.

## IV.   NOMURA'S BREACH OF ITS CURE OR REPURCHASE OBLIGATION.

42.     Between June and September of 2012, certain Certificateholders notified the Trustee of breaches of representations and warranties with respect to certain Group II Mortgage Loans. The Trustee promptly sent notice of these breaches to Nomura (the "Breach Notices"). The following table lists each Breach Notice sent by the Trustee and the number of breaching Group II Mortgage Loans included therein, and Exhibit 3 identifies the specific Group II Mortgage Loans included in each Breach Notice:

| Date Trustee Sent Breach Notice to Nomura | Date Trustee Received Notice from Holders | Number of Breaching Group II Mortgage Loans |
|---|---|---|
| June 14, 2012 | June 11, 2012 | 218 |
| July 16, 2012 | July 10, 2012 | 175 |
| July 19, 2012 | July 16, 2012 | 229 |
| July 20, 2012 | July 18, 2012 | 28 |
| August 1, 2012 | July 25, 2012 | 190 |
| August 7, 2012 | August 2, 2012 | 140 |
| August 20, 2012 | August 10, 2012 | 43 |
| August 29, 2012 | August 17, 2012 | 134 |
| August 30, 2012 | August 21, 2012 | 233 |
| September 13, 2012 | September 5, 2012 | 194 |
| | Total: | 1,584 |

43.     Though it was under no obligation to do so, the Trustee attached to the Breach Notices voluminous reports and supporting documentation detailing breaches found with regard to each of the 1,584 defective Group II Mortgage Loans, including both (i) the specific representations and warranties breached for each Mortgage Loan and (ii) a detailed narrative description of the facts establishing the breach.   The Breach Notices demanded that Nomura repurchase the defective Mortgage Loans in the event Nomura was unable to cure the breaches.

44.     In response to the Breach Notices, ***Nomura conceded that 111 Group II Mortgage Loans materially breached one or more representations and warranties*** (the "Admitted Breaches").   Nomura failed to cure the remaining breaches and failed to repurchase any of the identified Mortgage Loans, even ones with Admitted Breaches.

45.     With respect to the Group II Mortgage Loans with Admitted Breaches, Nomura apparently decided to stall.   It stated that it would consider repurchasing such loans if the Trustee (i) calculated the Purchase Price for each Loan; (ii) confirmed that such loans were "non-performing"; and (iii) confirmed that none of the Loans had been liquidated.   Neither the PSA nor the MLPA require the Trustee to do any these things.   To the contrary, the definition of "Purchase Price" requires Nomura to provide an Officer's Certificate to the Trustee confirming the Purchase Price, and Section 2.02(d) of the PSA requires Nomura to "provide written notice to the Securities Administrator detailing the components of the Purchase Price, signed by an authorized officer."   Nevertheless, in an effort to accommodate Nomura's request, the Trustee requested that the Master Servicer calculate the Purchase Price, and provided the Master Servicer's information to Nomura as it was received.

46.     Further, the payment status of a Mortgage Loan has no bearing on Nomura's repurchase obligation.  Neither the PSA nor the MLPA limit Nomura's repurchase obligation to the narrow group of Mortgage Loans that are non-performing but not yet liquidated by the Servicer.  The parties would surely have written such a limitation on the cure/repurchase mechanism into the contract if they had intended to so substantially narrow Nomura's obligations and the Trust's safeguards against undisclosed risks.  For a breaching Mortgage Loan to be subject to repurchase, the breach must simply materially and adversely affect the value of the Mortgage Loan or the interests of Certificateholders therein.  A representation and warranty breach with respect to a performing loan can materially and adversely affect the value of the loan and the interests of Certificateholders because the breach—for example, misrepresentations regarding a borrower's other debt obligations or income—can significantly increase the risk that the loan will default in the future.  That increased risk is sufficient to trigger Nomura's repurchase obligation.

47.     Whether a Mortgage Loan has been liquidated is also irrelevant.  Section 9 of the MLPA and Section 2.03 of the PSA require Nomura to repurchase a breaching "Mortgage Loan" if it is unable to cure the breach.  The definition of "Mortgage Loan" makes clear that this includes all mortgage loans "identified in the Mortgage Loan Schedule, *notwithstanding foreclosure or other acquisition of title of the related Mortgaged Property*."  PSA § 1.01 (emphasis added).  Indeed, not only is Nomura's assertion contrary to the terms of the governing agreements, it is flatly contradicted by Nomura's practice under contracts with substantially similar terms.  The Depositor—Nomura's affiliate—is required to file quarterly ABS-15G reports with the Securities & Exchange Commission disclosing, among other things, the number and dollar value of loans that were the subject of a repurchase demand and the number and dollar

value of loans repurchased by the responsible party.  The ABS-15G reports explain that the dollar value of the loans submitted for repurchase is based on the outstanding principal balance of each loan as of "the end of the reporting period or the most recent balance available for assets that remain in the pool at that time, or the balance as of the date of the last payment made by the obligor *if the asset was liquidated or removed from the pool* prior to the end of the reporting period."[4]  The reports also state that the number of loans that Nomura actually repurchased, or had actually agreed to repurchase, "***may include [loans] that were previously liquidated, and for which a make-whole payment was made in lieu of repurchase.***"[5]  Nomura is the responsible party for all of the trusts included in the Depositor's filings in which loans were actually repurchased or make-whole payments were made.

48.     Nomura's practice, as described in the ABS-15G reports, is consistent with industry practice.  The term "repurchase" is a recognized industry term that is understood to refer to a mechanism to make a mortgage loan purchaser whole for a seller's breach of its representations and warranties with respect to the securitized loans.  The mechanism ensures that the sponsor is responsible for and retains the entirety of the risk of loss associated with any breach of the representations and warranties.  Make-whole payments also ensure that disputes between the Trustee and Nomura relating to representation and warranty breaches do not hinder loss mitigation efforts with respect to Loans in default.  Under the PSA, the Servicer is required to service the Mortgage Loans in the best interests of the Certificateholders, consistent with industry standards and in the same way it would service loans in its own portfolio.  When a

---

[4]   *See*, *e.g.*, Nomura Asset Acceptance Corp. Form ABS-15G filed Feb. 14, 2013, *available at* http://www.sec.gov/Archives/edgar/data/888874/000089109213001375/e52071ex99_1.htm (emphasis added).

[5]  *Id.* (emphasis added).

borrower has ceased making mortgage payments, industry standards require the Servicer to, among other things, diligently pursue repayment from the borrower, including through foreclosure. Parallel efforts to recover from the borrower should be allowed to proceed unimpeded by disputes regarding Nomura's repurchase obligation. Indeed, such loss mitigation efforts would reduce Nomura's potential repurchase liability—for example, recoveries through the foreclosure process would reduce the outstanding principal balance included in the Purchase Price.

49.     The MLPA required Nomura to attempt to cure the identified breaches within ninety days of receiving notice from the Trustee and, if it could not cure the breaches, to repurchase the affected Group II Mortgage Loans. Nomura has failed either to cure or to repurchase a single such Loan.

50.     Nomura's opportunity to cure has long since expired with respect to the breaches of representations and warranties Nomura itself discovered during or after its due diligence.

## FIRST CAUSE OF ACTION

### Breach of Representation & Warranty: Specific Performance

51.     Plaintiff incorporates by reference the allegations in the preceding paragraphs 1-50 as if they were set forth fully herein.

52.     The MLPA is a valid, enforceable agreement to which Nomura is a party. The PSA is a valid and enforceable agreement related to, and executed contemporaneously with, the MLPA.

53.     Under the terms of the MLPA, and through the assignment in the PSA of the Depositor's rights under the MLPA, the Trustee is given the right to enforce the obligations of Nomura to the Trust and Certificateholders.

54.     The Trustee has performed all of its obligations and prerequisites with regard to and in advance of filing this action described herein.  In particular, the Trustee delivered the Breach Notices to Nomura on June 14, 2012; July 16, 2012; July 19, 2012; July 20, 2012; August 1, 2012; August 7, 2012; August 20, 2012; August 29, 2012; August 30, 2012; and September 13, 2012 identifying a total of 1,584 Group II Mortgage Loans in breach of one or more representations and warranties that materially and adversely affect the value of the Loans and the interests of Certificateholders therein.  More than ninety days have passed since the Trust notified Nomura of its breaches of representations and warranties in each of the Breach Notices.

55.     Section 2.03(c) of the PSA and Section 9 of the MLPA require Nomura to repurchase any Mortgage Loan within 90 days of discovery or notice of a breach of its representations and warranties if that breach has not been cured by Nomura and materially and adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders.

56.     Nomura breached its obligations under the MLPA and PSA by not curing the breaches of representations and warranties with respect to the Group II Mortgage Loans identified in the Breach Notices or repurchasing the identified Group II Mortgage Loans.

57.     The Trust has been damaged by Nomura's breaches.  Nomura's breaches materially and adversely affect the value of the identified Group II Mortgage Loans and the interests of the Certificateholders.

58.     The Trust is therefore entitled to an order that Nomura must specifically perform its obligations under the PSAs—specifically, that it must repurchase all Group II Mortgage Loans breaching Nomura's representation and warranties, both those listed in the Breach Notices and those identified in the future.

## SECOND CAUSE OF ACTION

### Breach of Contract: Damages for Failure to Cure/Repurchase

59.     Plaintiff incorporates by reference the allegations in the preceding paragraphs 1-
58 as if they were set forth fully herein.

60.     The MLPA is a valid, enforceable agreement to which Nomura is a party.  The
PSA is a valid and enforceable agreement related to, and executed contemporaneously with, the
MLPA.

61.     Under the terms of the MLPA and PSA, the Trustee is given the right and duty to
enforce the obligations of Nomura to the Trust and Certificateholders.

62.     The Trustee has performed all of its obligations and prerequisites with regard to
and in advance of filing this action described herein.  In particular, the Trustee delivered the
Breach Notices to Nomura on June 14, 2012, July 16, 2012, July 19, 2012, July 20, 2012, August
1, 2012, August 7, 2012, August 20, 2012, August 29, 2012, August 30, 2012, and September
13, 2012 identifying a total of 1,584 Group II Mortgage Loans in breach of one or more
representations and warranties.  More than ninety days have passed since the Trust notified
Nomura of its breaches of representations and warranties.

63.     Nomura has failed to cure or repurchase any Mortgage Loans identified in the
Breach Notices in violation of Section 2.03(c) of the PSA and Section 9 of the MLPA.

64.     Nomura should be required to pay damages for the losses caused to the Trust by
Nomura's breaches of its contractual duties.  As Nomura has refused to comply with its
repurchase obligations, even with respect to Group II Mortgage Loans with Admitted Breaches,
the Trust is not limited to its contractual repurchase remedy. This is especially true where, as
here, Nomura, the responsible party, has frustrated the implementation of that remedy.

65.     The Trust is therefore entitled to damages, in an amount to be determined at trial, for Nomura's breaches of contract.

### THIRD CAUSE OF ACTION

**Breach of Contract: Failure to Notify and Cure or Repurchase**

66.     Plaintiff incorporates by reference the allegations in the preceding paragraphs 1-65 as if they were set forth fully herein.

67.     The MLPA is a valid, enforceable agreement to which Nomura is a party.  The PSA is a valid and enforceable agreement related to, and executed contemporaneously with, the MLPA.

68.     Under the terms of the MLPA, and through the assignment in the PSA of the Depositor's rights under the MLPA, the Trustee is given the right to enforce the obligations of Nomura to the Trust and Certificateholders.

69.     The Trustee has performed all of its obligations and prerequisites with regard to and in advance of filing this action described herein.

70.     Section 9 of the MLPA and Section 2.03 of the PSA require Nomura to notify the Trustee of a breach of any of its representations and warranties in Section 8 of the MLPA that materially and adversely affects the value of the Mortgage Loan or the interests of Certificateholders therein promptly upon its discover of such breach.

71.     Section 9 further requires Nomura to repurchase any Group II Mortgage Loan within 90 days of its discovery of such a breach if that breach has not been cured by Nomura.

72.     Based on the due diligence it conducted on a sample of the Mortgage Loans, Nomura discovered that certain of the Group II Mortgage Loans breached its representations and warranties, including Group II Mortgage Loans not identified in the Breach Notices, and that

26

these breaches materially and adversely affect the value of the Loan and the interests of Certificateholders therein.

73.     Nomura breached its obligations under the MLPA by (a) failing to provide notice to the Trustee of breaches identified during its due diligence and otherwise with respect to Group II Mortgage Loans; (b) failing to cure the discovered breaches or repurchase the defective Group II Mortgage Loans.

74.     Nomura's breaches of the MLPA have fundamentally defeated the protection the cure/repurchase mechanism was intended to provide.

75.     The Trust is entitled to an order that Nomura must specifically perform its obligation to repurchase Group II Mortgage Loans with respect to which Nomura discovered breaches of representations and warranties, which materially and adversely affect the value of the Loans and/or the interests of the Trust and Certificateholders therein.

76.     The Trust is further entitled to an award of damages for Nomura's failure to notify the Trustee of breaches of representations and warranties that Nomura discovered and its subsequent failure to cure such breaches or repurchase such Group II Mortgage Loans, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

(a)     On the first cause of action, for an order of specific performance that Nomura be required to repurchase all Group II Mortgage Loans identified in the Breach Notices and those identified in the future;

(b)     On the second cause of action, for an award of damages against Nomura compensating the Trust for Nomura's breaches of the PSA and MLPA relating to the Group II

Mortgage Loans identified in the Breach Notices and those identified in the future, in an amount to be proven at trial;

      (c)    On the third cause of action, for an order of specific performance that Nomura be required to repurchase all Group II Mortgage Loans with respect to which Nomura discovered breaches of representations and warranties, and an award of damages for Nomura's failure to comply with its obligation to notify the Trustee of such breaches, and its subsequent failure to either cure such breaches or repurchase the affected Group II Mortgage Loans.

      (d)    All costs of the Trust associated with this action (including the Trustee's attorneys' fees), in an amount to be proven at trial;

      (e)    Prejudgment interest as approved by the Court; and

      (f)    For all such other relief to which the Plaintiff is entitled under law or in equity.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury for all issues so triable as a matter of right.

MCKOOL SMITH, P.C.

By: _____

Kyle A. Lonergan
Robert W. Scheef
Courtney B. Statfeld

One Bryant Park, 47th Floor
New York, NY 10036
klonergan@mckoolsmith.com
rscheef@mckoolsmith.com
cstatfeld@mckoolsmith.com
(t) (212) 402-9400
(f) (212) 402-9444

*Attorneys for Plaintiff*